**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **HOLLIE LALENA HOWARD,** | : | **Civil No. 1:20-cv-02321-MCC** |
| | : | |
| **Plaintiff** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **v.** | : | |
| | : | |
| **KILOLO KIJAKAZI,** | : | |
| **Acting Commissioner of Social Security[1],** | : | |
| | : | |
| **Defendant** | : | |

**MEMORANDUM OPINION**

## I.   Introduction

For Administrative Law Judges (ALJs), Social Security disability determinations frequently entail an informed assessment of competing medical opinions coupled with an evaluation of a claimant's subjective complaints. Once the ALJ completes this task, on appeal it is the duty and responsibility of the district court to review these ALJ findings, judging the findings against a deferential standard of review which simply asks whether the ALJ's decision is supported by substantial evidence in the record,  see 42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533,

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g) Kilolo Kijakazi is substituted for Andrew Saul as the defendant in this suit.

536 (M.D. Pa. 2012), a quantum of proof which "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988).

Plaintiff Hollie Lalena Howard ("Howard"), an adult individual who resides within the Middle District of Pennsylvania, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Howard filed for disability benefits and supplemental security income, alleging that she was disabled due to manic depression, personality disorder, and anxiety.

This matter is before us, upon consent of the parties pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure. After reviewing the parties' briefs, the Commissioner's final decision, and the relevant portions of the certified administrative transcript, we find the Commissioner's final decision is not supported by substantial evidence. Accordingly, the Commissioner's final decision will be vacated.

## II.   **Statement of Facts and of the Case**

On June 20, 2017, Howard applied for supplemental security insurance benefits, and on June 30, 2017, Howard applied for applied for disability insurance

benefits, (Tr. 98), alleging disability due to manic depression, personality disorder, and anxiety. (Tr. 207). At the administrative hearing, Howard also cited an array of physical and emotional impairments, including anger, anxiety, inability to concentrate, manic and depressed episodes, panic attacks two to three times per week, self-isolation, and difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, climbing stairs, remembering, completing tasks, understanding, following instructions, getting along with others, using her hands, finishing what she starts, and handling stress and changes in routine. (Tr. 103). Howard initially alleged that her disability began on June 1, 2011, when she was 37 years old. (Tr. 98, 105). At the end of the administrative hearing, Howard amended her alleged onset date of disability to January 1, 2016, when she was 42 years old. (Tr. 44, 96, 105). On the date of the ALJ's decision, Howard had past relevant work experience as an industrial truck operator. (Tr. 104).

With regard to her mental impairments, the record indicates that Howard underwent mental health treatment since at least 2009 for major depressive disorder. (Tr. 278-431). For much of this time Howard treated at Spindletop MHMR Services. (Tr. 364-837). The records of this mental health provider and treatment source consistently documented that Howard's Global Assessment of Functioning, or GAF, score reflected that the plaintiff experienced profound psychological impairments over the span of many months and years. For example, between July 2009 and April

2011, Howard's caregivers consistently rated her global assessment of functioning score at 45 or 46. (Tr. 364, 374, 380, 387, 396, 403, 432, 441, 452, 466). Moreover, significantly, by the Spring of 2017, Howard's GAF score had declined substantially from 45 to a GAF score of 34. Treating sources then persistently rated Howard's GAF score at 34 from April of 2017 through February 2018. (Tr. 498, 510, 607, 637, 649, 677, 696, 773, 803, 847).

These were clinically significant findings, since a GAF score, or a Global Assessment Functioning scale, was a psychometric tool which took into consideration psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR"). In this regard, GAF scores "in the range of 61–70 indicate 'some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning.' Diagnostic and Statistical Manual of Mental Disorders ('DSM IV') 34 (American Psychiatric Assoc. 2000). GAF scores in the 51–60 range indicate moderate impairment in social or occupational functioning." Cherry v. Barnhart, 29 Fed.Appx. 898, 900 (3d Cir. 2002). DaVinci v. Astrue, 1:11-CV-1470, 2012 WL 6137324 (M.D. Pa. Sept. 21, 2012) report and recommendation adopted, Davinci v. Astrue, 1:11-CV-1470, 2012 WL 6136846 (M.D. Pa. Dec. 11, 2012). "A GAF score of 41–50 indicates 'serious symptoms (e.g.,

suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).' DSM–IV at 34. A score of 50 is on the borderline between serious and moderate symptoms." Colon v. Barnhart, 424 F. Supp. 2d 805, 809 (E.D. Pa. 2006). See Shufelt v. Colvin, No. 1:15-CV-1026, 2016 WL 8613936, at *2 (M.D. Pa. Sept. 15, 2016), report and recommendation adopted sub nom. Shulfelt v. Colvin, No. 1:15-CV-1026, 2017 WL 1162767 (M.D. Pa. Mar. 29, 2017). A GAF score of 31-40 signifies some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. A GAF scores as low as 30 typically indicate behavior that is considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or an inability to function in almost all areas. *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision*, 34, Washington, DC, American Psychiatric Association, 2000. ("DSM-IV-TR"). Thus, Howard's treating source GAF scores consistently rated the degree of her impairment as indicative of either serious symptoms or major impairment in several spheres of behavior.

With respect to the alleged disability period, Howard sought treatment at the Spindletop Center in April of 2017 for major depressive disorder, attention deficit/hyperactivity disorder, cannabis use disorder, and borderline personality

disorder. (Tr. 468). She reported a history of suicidal ideation but no recent attempts. (Tr. 470). Howard had a history of impulse and anger control as well as anxiety; depression causing severe or dangerous problems; but no evidence of psychosis/thought disturbance, cognition, mania, or antisocial behavior. (Tr. 480).

A psychiatric evaluation in May of 2017 revealed that Howard had a history of bipolar disorder, and she had been receiving medication to treat this disorder for a period of time. (Tr. 507). It was noted that she used cannabis daily and had previously used methamphetamine. (Id.) At this time, Howard reported experiencing depression since she was released from incarceration in December 2015, and she also struggled to maintain housing. (Id.) She stated that when she felt depressed, she had trouble eating, sleeping, and taking care of her basic hygiene needs. (Id.) Howard also had a history of ADHD, which caused her difficulty maintaining attention and with her ability to concentrate. (Id.) On examination, Howard was oriented to person, place, and time; had an irritable mood and affect; had no abnormal or psychotic thoughts but had thoughts of worthlessness and loneliness; her insight and judgment were poor; her memory was fair; and she had concentration problems. (Tr. 513-15). She was started on medications at this time. (Tr. 518).

At a May 26, 2017, follow up, Howard reported continued depression, mood swings, anxiety, agitation, racing thoughts, and mild paranoia. (Tr. 572). It was noted

that she made minimal progress, and she was counseled on the importance of consistently taking her medication and attending scheduled appointments. (Id.)

In October of 2017, Howard underwent a mental status examination with Dr. Nisha Amin, Ph.D. (Tr. 579-82). At this examination, Dr. Amin noted that Howard's hygiene was adequate, her psychomotor activity was unremarkable, speech was coherent and relevant, and her communication skills were adequate. (Tr. 580). There was no evidence of any looseness of associations regarding her thought process. (Id.) She was oriented to person, place, time, and situation, and her remote memory was good. (Tr. 581). Her judgment and insight was noted to be generally intact. (Id.) Dr. Amin opined that Howard's prognosis was good if she could find a vocation and her psychological symptoms could be stabilized with compliant, consistent medication and counseling, as well as sobriety. (Id.)

Dr. Susan Posey, PsyD., a consultative examiner, reviewed the medical records in November of 2017 and Dr. Posey found that Howard had understanding and memory limitations; that she was moderately limited in her ability to understand and remember detailed instructions; moderately limited in her ability to maintain attention and concentration for extended periods; moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual; and moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 62-63). Dr. Posey

7

concluded that Howard could understand, remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for extended periods; accept instruction; and respond appropriately to changes made in a routine work setting. (Tr. 63).

There were several enigmatic aspects to Dr. Posey's medical opinion, an opinion which formed the lynchpin of this decision denying Howard's application for benefits. First, that opinion was internally inconsistent in some respects. For example, Dr. Posey opined that Howard suffered "moderate" limitations maintaining attention and concentration for extended periods, (Tr. 63), but then stated without qualification that she could "concentrate for extended periods." (Id.) Dr. Posey also stated that Howard was "moderately limited" in carrying out detailed instructions, but then indicated that she could "carry out detailed but not complex instructions." (Id.) Dr. Posey provided no further explanation of what she meant by these inconsistent descriptions of Howard's moderately limited cognitive ability.

Furthermore, some of Dr. Posey's findings were unsupported by any narrative, despite the fact that the form the doctor completed expressly called for such a narrative. Thus, Dr. Posey stated that Howard was "moderately limited" in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Id.) The disability assessment form completed by the doctor then called upon her to "[e]xplain in narrative form" the limitations which

she had found. (Id.) Dr. Posey's response to this question leaves us at sea when we try to understand the basis for this opinion, since the narrative she provided consisted of a single letter: "X". (Id.) Finally, while it appears that Dr. Posey had access to the Spindletop treatment records which contained multiple GAF scores over the span of months which consistently rated the degree of her impairment as indicative of either serious symptoms or major impairment, Dr. Posey's opinion made no reference to these GAF scores.

In February of 2018, treatment notes from Spindletop indicate that Howard was still experiencing depression, obsessive thoughts, mood swings, paranoia, and agitation, along with other symptoms. (Tr. 599). She reported suicidal thoughts but no plan, action, or intent. (Id.) As for her depression, the treatment plan included a medication regimen, psychotherapy sessions, and telemedicine appointments. (Tr. 601). Notes from the Orange Outpatient Clinic at this time indicated that Howard had a history of anxiety, antisocial behavior, anger control, and adjustment to trauma; and that her depression, anxiety, impulse control, interpersonal problems, and substance abuse were causing problems. (Tr. 684). She was also noted to have moderate issues with family and social functioning, living skills, sleep, and decision making. (Tr. 685). She experienced suicidal ideation but had no intent or plan. (Tr. 687). Treatment notes from February and March 2018 showed that Howard missed several appointments. (Tr. 731-36). Howard was seen at an appointment in April,

but then missed several appointments and was removed from the list of referrals. (Tr. 739-41).

In December of 2018, Howard underwent a psychiatric evaluation in Lebanon County, Pennsylvania. (Tr. 934-38). This evaluation first noted that Howard was trying to get back into treatment, as she had been off of her medications since leaving a rehabilitation program in August and due to her addiction issues with heroin and crystal meth. (Tr. 934). She reported doing fairly well but stated that she had manic episodes and depression. (Id.) A mental status evaluation revealed that Howard's attitude was cooperative, her speech was normal, her mood was fair, and her thought process was organized. (Tr. 936). She was oriented to person, place, and time, her insight was fair, and her judgment was limited. (Id.) She denied auditory or visual hallucinations, and her affect was tearful. (Id.) She was started on a medication regimen and participated in counseling two days per week. (Id.)

Howard received counseling through T.W. Ponessa and Associates. (Tr. 945). In January of 2019, her treatment plan indicated that she was receiving substance abuse treatment at that time, and she was staying at the Fresh Start shelter. (Id.) In February, Howard reported doing better. (Tr. 952). On examination, she was oriented to person, place, and time, she denied any suicidal ideation, reported paranoid thinking, and reported a decrease in mixed manic episodes. (Id.) Howard's cognition and memory were fair, and her long-term memory was grossly intact. (Id.)

It was noted that Howard was improving but reported worsening concentration. (Id.) Howard was ultimately discharged from counseling in mid-2019. (Tr. 939-44).

The ALJ conducted a hearing in Howard's case on September 16, 2019. (Tr. 98). Howard appeared by phone. (Tr. 98). Howard and a vocational expert both testified at this hearing. At the hearing, Howard testified that she has experienced intermittent incarceration, including incarceration at the time of the hearing due to burglary, and has had trouble obtaining housing due to impoverishment. (Tr. 18-19, 29). She stated that she lost her most recent job because of a verbal argument at work. (Tr. 19-20). She explained that she has both manic and depressed episodes, constant insomnia, fidgeting when manic, difficulty focusing, difficulty with chores and daily responsibilities when depressed, anxiety, social paranoia, and panic attacks two to three times per week. (Tr. 21-25).

Howard further testified that she is happy or manic for one week or less per month. (Tr. 25). She stated that she argues with people often, even when taking medication for bipolar disorder. (Tr. 26, 28). She also testified that, though she previously used marijuana as often as she could, she does not use marijuana during her current incarceration and that she experienced bipolar disorder "worse" when not using marijuana. (Tr. 27, 31). At the time of the administrative hearing, she was isolated in her cell and rarely argued with others because of limited contact with others. (Tr. 28). She testified that she prefers to be alone in prison, but that at times,

she has had groups of more than ten friends. (Tr. 29, 32). Howard also testified that, prior to her most recent incarceration, she smoked one pack of cigarettes each day, and that she would get the cigarettes from other people or buy bulk after "little odd jobs," like babysitting. (Tr. 34).

The vocational expert then testified that a person of the same age, education, and work experience as Howard with no physical exertional limitations, who was limited to simple and routine tasks involving only simple work-related decisions with few, if any, workplace changes, no production-pace work, only occasional interaction with supervisors, coworkers, and the public, could not perform Howard's past work but could perform the jobs of baker racker, DOT number 524.687-018, housekeeping cleaner, DOT number 323.687-014, and bindery-machine feeder/off-bearer, DOT number 653.686-026. (Tr. 40). The vocational expert testified that a typical employer would tolerate absences of one day per month or twelve days per year and would tolerate up to 15% off-task behavior in addition to one 20-to-30-minute lunch break, two 10-to-15-minute breaks, and one or two 5-to-10-minute breaks each day. (Tr. 41). The vocational expert testified that a person like the one described above who exceeded the allowed absences or off-task behavior described above would be unemployable. (Tr. 41). The vocational expert also testified that a person would be unemployable if they needed to take more than one to two 5-to-10-minute breaks throughout the day as unscheduled breaks. (Tr. 43).

Following this hearing on November 18, 2019, the ALJ issued a decision denying Howard's application for benefits. (Tr. 98-106). In that decision, the ALJ first concluded that Howard met the insured status requirements of the Social Security Act through March 31, 2019. (Tr. 100). At Step 1, the ALJ determined that Howard had not engaged in substantial gainful activity since June 1, 2011, the alleged onset date. (Tr. 100). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found Howard had the following severe impairments: major depressive disorder; anxiety disorder; bipolar disorder; cannabis abuse disorder; and opioid use disorder. (Tr. 101). At Step 3 the ALJ determined that Howard did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 101).

Between Steps 3 and 4 the ALJ concluded that Howard retained

[T]he residual functional capacity to perform a full range of work at all exertional levels and [] can perform work that is limited to simple and routine tasks; involving only simple, work-related decisions; and with few, if any, workplace changes. [Howard] cannot perform production pace work and can occasionally interact with supervisors, coworkers, and the public.

(Tr. 102).

In reaching this RFC determination, the ALJ made the following findings:

The record includes a July 2017 Social Security field office report that the claimant had difficulty concentrating and answering and no

difficulty hearing, breathing, understanding, talking, or with her coherency (2E).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because of the following reasons. The claimant argues she is unable to work because of her anger, anxiety, and cannot concentrate. She alleges she had difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions, getting along with others, and using her hands. The claimant insists she does not finish what she starts, does not handle stress or changes in routine well, has manic and depressed episodes and panic attacks two or three times a week, and isolates herself (Hearing Testimony; 4E). The record shows the claimant has major depressive disorder, anxiety disorder, bipolar disorder, cannabis abuse disorder, and opioid use disorder (IF; 5F). For these conditions, the claimant received psychiatric care, counseling, peer support, and medication (3F; 4F). Longitudinal treatment notes do not support the claimant's allegations. These notes generally show the claimant is fully oriented and cooperative with congruent affect, fair eye contact, normal speech, fair memory, intact and logical thought associations, appropriate thought content, goal directed thought process, intact and age appropriate fund of knowledge, fair cognition, normal behavior, normal fund of knowledge, fair insight, and fair judgment (IF; 3F; 4F; 6F; 8F). During an October 2017 psychiatric consultative examination, the claimant was fully oriented and cooperative with adequate hygiene, unremarkable psychomotor activity, normal eye contact, normal voice, coherent and relevant speech, intact abstract thinking, and normal thought. She had clear sensorium, good immediate memory, good remote memory, average intelligence, intact insight, and good judgment (2F). At a December 2018 psychiatric evaluation, the

14

claimant was fully oriented and cooperative with fair mood, appropriate affect, good eye contact, normal speech, organized though process, and fair insight (5F). At this evaluation, the claimant "report[ed] that she's been off medications since she left rehab in August of this year. She's been off her medication due to her problems with addiction to heroin and crystal meth" (5F/5). In February 2019, the claimant's counselor notes the claimant "smokes [marijuana] daily" (6F/14). The claimant's allegations are inconsistent with her activities of daily living. She states she listens to music and can prepare simple meals, walk, shop in stores, pay bills, count change, and handle a savings account. The claimant notes she had friends of more than ten people, babysat for a friend for two hours a day for three weeks, and worked at a fast food restaurant (Hearing Testimony; 4E). Therefore, the undersigned finds the claimant can perform work that is limited to simple and routine tasks; involving only simple, work-related decisions, and with few, if any workplace changes. She cannot perform production pace work and can occasionally interact with supervisors, coworkers, and the public . . . .

The undersigned has fully considered the medical opinions and prior administrative medical findings as follows:

The November 2, 2017 opinion of state agency psychological consultant, Susan Posey, PsyD, is mostly persuasive. The moderate limitations opined by Dr. Posey are supported by the above outlined treatment records. They are also supported by the October 30, 2017 consultative examination by Nisha Amin, PhD (2F). Dr. Amin did not opine specific work related limitations, but her examination report supports no more than moderate limitations. Beyond Dr. Posey's opinion, the residual functional capacity contains additional social and adaptation limitations to give further accommodation to the claimant reporting.

The record includes a statement that the claimant's Global Assessment of Functioning (GAF) is 34, implying some impairment in reality testing or communication or major impairment in several areas (IF). While considered as evidence, "several problems with a GAF rating make it inherently of little evidentiary value" (AM-13066 REV-2 (E)). Thus, the claimant's GAF scores are not considered inherently valuable or persuasive.

(Tr. 103-04).

The ALJ then found that Howard could not perform her past work but retained the capacity to perform other jobs that existed in significant numbers in the national economy. Having reached these conclusions, the ALJ determined that Howard had not met the demanding showing necessary to sustain this claim for benefits and denied this claim.

This appeal followed. (Doc. 1). On appeal, Howard challenges the adequacy of the ALJ's decision arguing that ALJ erred in his consideration—and articulation of his consideration—of the medical evidence when formulating Howard's residual functional capacity.[2] (Doc. 20, at 1-2).

As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record, while we regard this as a close case, we conclude that the ALJ's decision should be REMANDED for further consideration by the Commissioner in accordance with this decision.

III.   **Discussion**

A.     **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the

_____

[2] Although we note that Howard enumerates the issues differently in her brief, each issue is related to the ALJ's RFC determination and the ALJ's treatment of the medical evidence during the RFC determination. (See Doc. 20, at 11-24).

findings of the final decision-maker are supported by substantial evidence in the record.  See 42 U.S.C. § 405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency

> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
> e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."
> Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v.
> Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)
> (comparing the substantial-evidence standard to the deferential clearly-
> erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that [she] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512 F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts"); see also Wright v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that

decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

## B.   Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); 42 U.S.C. §1382c(a)(3)(A); see also 20 C.F.R. §§404.1505(a), 416.905(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 42 U.S.C. §1382c(a)(3)(B); 20 C.F.R. §§404.1505(a), 416.905(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §§404.1520(a), 416.920(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe

impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §§404.1520(a)(4), 416.920(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett, 220 F.3d at 121 (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §§404.1545(a)(2), 416.945(a)(2).

Once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Rathbun v. Berryhill, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), report and recommendation adopted, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018); Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at *5 (M.D. Pa. Mar. 29, 2017), report and

recommendation adopted sub nom. Metzgar v. Colvin, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017)..

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. Mason, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC.  20 C.F.R. §§404.1512(f), 416.912(f); Mason, 994 F.2d at 1064.

The ALJ's disability determination must meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. Id. at 706-707. In addition, "[t]he ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis

for his finding." <u>Schaudeck v. Comm'r of Soc. Sec.</u>, 181 F. 3d 429, 433 (3d Cir. 1999).

### C.   <u>Legal Benchmarks for the ALJ's Assessment of Medical Opinions</u>

The plaintiff filed this disability application in June of 2017, shortly after a paradigm shift in the manner in which medical opinions were evaluated when assessing Social Security claims. Prior to March 2017, ALJs were required to follow regulations which defined medical opinions narrowly and created a hierarchy of medical source opinions with treating sources at the apex of this hierarchy. However, in March of 2017, the Commissioner's regulations governing medical opinions changed in a number of fundamental ways. The range of opinions that ALJs were enjoined to consider were broadened substantially, and the approach to evaluating opinions was changed from a hierarchical form of review to a more holistic analysis. As one court as aptly observed:

> The regulations regarding the evaluation of medical evidence have been amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion." <u>Revisions to Rules Regarding the Evaluation of Medical Evidence</u> ("Revisions to Rules"), 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), <u>see</u> 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at

*5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

> An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June 10, 2011). It follows that an ALJ can give partial credit to all medical opinions and can formulate an RFC based on different parts from the different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is no evidence of any credible medical opinion supporting a claimant's allegations of

disability "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." <u>Cummings</u>, 129 F.Supp.3d at 214–15.

### D.    This Case Will Be Remanded for Further Consideration and Articulation of the Grounds for the ALJ's Decision.

As we have noted, an ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter</u>, 642 F.2d at 704. Furthermore, the ALJ must also "indicate in his decision which evidence he has rejected and which he is relying on as the basis for his finding." <u>Schaudeck</u>, 181 F.3d at 433. It is well settled that "[t]he ALJ must consider all relevant evidence when determining an individual's residual functional capacity." <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 41 (3d Cir. 2001). Therefore, an ALJ must "explain his reasons for discounting all of the pertinent evidence before him in making his residual functional capacity determination." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 121 (3d Cir. 2000). Moreover, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence are persuasive.

Here, while we find this to be an extremely close case, we conclude that the ALJ's RFC determination is not supported by an adequate explanation. The ALJ's full analysis of the medical opinion evidence was as follows:

> The November 2, 2017 opinion of state agency psychological consultant, Susan Posey, PsyD, is mostly persuasive. The moderate limitations opined by Dr. Posey are supported by the above outlined

26

treatment records. They are also supported by the October 30, 2017
consultative examination by Nisha Amin, PhD (2F). Dr. Amin did not
opine specific work related limitations, but her examination report
supports no more than moderate limitations. Beyond Dr. Posey's
opinion, the residual functional capacity contains additional social and
adaptation limitations to give further accommodation to the claimant
reporting.

(Tr. 104).

As explained in Subsection (C) above, an ALJ must explain how persuasive
he finds each medical opinion. 20 C.F.R. § 404.1520c(a), (b)(1)-(2); 20 C.F.R. §
416.920c(a), (b)(1)-(2). To evaluate the persuasiveness, the ALJ must evaluate the
supportability and consistency of each medical opinion. 20 C.F.R. § 404.1520c(b),
(c)(1)-(2); 20 C.F.R. § 416.920c(b), (c)(1)-(2). Medical opinions and prior
administrative medical findings have greater supportability—and therefore
persuasiveness—when a "medical source" presents "more relevant [] objective
medical evidence and supporting explanations . . . to support his or her medical
opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(c)(1);
20 C.F.R. § 416.920c(c)(1). A medical opinion or prior administrative medical
finding has greater persuasiveness when a medical opinion or prior administrative
medical finding is "more consistent" with "the evidence from other medical sources
and nonmedical sources in the claim." 20 C.F.R. § 404.1520c(c)(2); 20 C.F.R. §
416.920c(c)(2).

Here, the ALJ analyzed the consistency of the medical opinion of Dr. Posey when the ALJ stated that it was supported by the treatment records and "the October 30, 2017 consultative examination by Nisha Amin, PhD." (Tr. 104). However, nothing in the short paragraph provides any insight into the ALJ's analysis of the supportability Dr. Posey's opinion; the ALJ's decision does not discuss whether Dr. Posey referenced the treatment records or any other sources in forming Dr. Posey's opinion. (Tr. 104). Even more troubling is the ALJ's failure to discuss either the supportability or the consistency of the medical opinion by Nisha Amin, PhD. (Tr. 104). The ALJ's assertion that Dr. Amin's opinion supports another opinion does not amount to a discussion of the consistency of Dr. Amin's opinion with the medical record.

Thus, it is unclear whether the ALJ meant that everything in Dr. Amin's opinion corresponds with Dr. Posey's opinion, or merely whether there are corroborative facts and findings within Dr. Amin's opinion. While we note that the ALJ's opinion mentions some of the findings laid out in these medical opinions in his discussion of the medical evidence, the opinion does not discuss the consistency or supportability of these opinions with the overall medical evidence of record. Rather, the ALJ vaguely asserts in one sentence that "[t]he moderate limitations opined by Dr. Posey are supported by the above outlined treatment records." (Tr. 104).

Furthermore, the ALJ did not discuss what appears to be the inconsistent and enigmatic findings by Dr. Posey. Indeed, in this decision the ALJ did not analyze, address, or even acknowledge, the internal inconsistencies in this opinion.  Thus, Dr. Posey opined that Howard suffered "moderate" limitations maintaining attention and concentration for extended periods, (Tr. 63), but then stated without qualification that she could "concentrate for extended periods." (Id.)  Similarly, Dr. Posey stated that Howard was "moderately limited" in carrying out detailed instructions, but indicated that she could "carry out detailed but not complex instructions." (Id.) None of these internal inconsistencies in Dr. Posey's opinion are addressed by the ALJ, who instead gave the opinion significant weight.

Further, some of Dr. Posey's findings were unsupported by any narrative, despite the fact that the form the doctor completed expressly called for such a narrative. Thus, Dr. Posey stated that Howard was "moderately limited" in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Id.) The disability assessment form completed by the doctor then called upon her to "[e]xplain in narrative form" the limitations which she had found. (Id.) Dr. Posey's response to this question leaves us at sea when we try to understand the basis for this opinion, since the narrative she provided consisted of a single letter: "X". (Id.)

Finally, while it appears that Dr. Posey had access to the Spindletop treatment records which contained multiple GAF scores over the span of months which consistently rated the degree of her impairment as indicative of either serious symptoms or major impairment, Dr. Posey's opinion made no reference to these GAF scores. These GAF scores represented the only treating source assessments of Howard's overall functioning.  They spanned many months, and these treating sources repeatedly and consistently found that Howard was profoundly impaired. Yet, this significant body of treating source evidence received scant attention from either Dr. Posey or the ALJ. Instead, the ALJ's consideration of this treating source evidence was both dismissive and somewhat inaccurate. On this score the ALJ simply noted that:

> The record includes a statement that the claimant's Global Assessment of Functioning (GAF) is 34, implying some impairment in reality testing or communication or major impairment in several areas (IF). While considered as evidence, "several problems with a GAF rating make it inherently of little evidentiary value" (AM-13066 REV-2 (E)). Thus, the claimant's GAF scores are not considered inherently valuable or persuasive.

(Tr. 103-04).

At the outset, the ALJ's statement that the record includes "a statement" that Howard's GAF score was 34 understates and misstates the clinical record. Contrary to the suggestion that the GAF score consisted of a single statement, in fact between July 2009 and April 2011, Howard's caregivers consistently rated her global

assessment of functioning score at 45 or 46. (Tr. 364, 374, 380, 387, 396, 403, 432, 441, 452, 466). Moreover, significantly, by the Spring of 2017, Howard's GAF score had declined substantially from 45 to a GAF score of 34.  These treating sources then persistently rated Howard's GAF score at 34 from April of 2017 through February 2018. (Tr. 498, 510, 607, 637, 649, 677, 696, 773, 803, 847). Thus, over a prolonged period of time Howard's treating source GAF scores consistently rated the degree of her impairment as indicative of either serious symptoms or major impairment. In our view, this treating source evidence warranted further consideration and articulation when evaluating the degree of Howard's impairment, particularly when we consider the inadequacies of Dr. Posey's opinion which served as the lynchpin for the decision to deny benefits in this case.

Accordingly, we cannot conclude that the ALJ adequately explained his treatment of the medical opinion evidence, and thus, the RFC determination, which essentially mirrors the findings in Dr. Posey's opinion. Because the ALJ failed to articulate his analysis of the medical opinions in this case, we cannot determine whether the ALJ's decision is supported by substantial evidence. Accordingly, we will remand this case to the ALJ for further evaluation, development, and assessment of the medical record.

Finally, we note that nothing in this Memorandum Opinion should be deemed as expressing a judgment on what the ultimate outcome of any reassessment of this

evidence should be. Rather, the task should remain the duty and province of the ALJ on remand.

An appropriate order follows.

/s/ *Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge